**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Smail Yaakoubi, | No. CV-14-01808-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Aetna Life Insurance Company; Marriott International Inc. Long-Term Disability Plan, | |
| Defendants. | |

Before the Court is Plaintiff's Motion for Judgment on the Administrative Record (Doc. 34), Defendants' Opposing Trial Brief (Doc. 35), and Plaintiff's Reply to Defendants' Opposing Trial Brief (Doc. 42). Plaintiff seeks judicial review of Defendant's denial of long-term disability benefits effective August 24, 2012.

I.    **LEGAL STANDARD**

This action is brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), which permits a participant or beneficiary to bring a civil action to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). The term "plan" includes any plan, fund, or program established or maintained by an employer for the purpose of providing its participants medical care

or benefits in the event of sickness, accident, disability, death, or unemployment. *Id.* § 1002(1), (3).

"Every employee benefit plan shall be established and maintained pursuant to a written instrument" that "provides for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *Id.* § 1102(a)(1). Every plan must "describe any procedure under the plan for allocation of responsibilities for the operation and administration of the plan" and "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." *Id.* § 1102(b). Further, every plan must "specify the basis on which payments are made to and from the plan." *Id.* In addition, a plan may provide "that any person or group of persons may serve in more than one fiduciary capacity with respect to the plan (including service both as trustee and administrator)." *Id.* § 1102(c)(1).

The plan administrator must provide each participant a summary plan description, which is "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* § 1022(a). The summary plan description also must "be written in a manner calculated to be understood by the average plan participant." *Id.*

"A district court must review a plan administrator's denial of benefits de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits.'" *Prichard v. Metro. Life Ins. Co.*, 783 F.3d 1166, 1168-69 (9th Cir. 2015) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The administrator bears the burden of proving the plan's grant of discretionary authority. *Id.* at 1169. An administrator has discretion only where a plan document unambiguously grants the administrator discretionary authority to grant or deny benefits under the plan. *Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1113-14 (9th Cir. 2001). "An allocation of decision-making

authority to [the administrator] is not, without more, a grant of discretionary authority in making those decisions." *Id.* at 1112-13.   If the language only arguably confers discretion, it does not unambiguously confer discretion, and the court must review the administrator's decision de novo. *Feibush v. Integrated Device Tech., Inc., Employee Benefit Plan*, 463 F.3d 880, 884 (9th Cir. 2006).   When a court reviews a plan administrator's decision de novo, the claimant bears the burden of proving he is entitled to benefits. *Muniz v. AMEC Constr. Mgmt.*, 623 F.3d 1290, 1294 (9th Cir. 2010).   The burden of proof remains with the claimant when disability benefits are terminated after an initial grant. *Id.*

Where a plan document unambiguously grants the administrator discretionary authority to grant or deny benefits under the plan, the court reviews the administrator's decision for abuse of discretion.   "A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination." *Pacific Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1042 (9th Cir. 2014).  A plan administrator abuses its discretion if it relies on clearly erroneous findings of fact in its determination. *Id.*

Where the plan administrator both evaluates claims and pays benefits claims, a reviewing court should consider that structural conflict of interest as a factor, among many, in determining whether the plan administrator abused its discretion in denying benefits. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 116 (2008).  A conflict may be given more weight where circumstances suggest a greater likelihood that it affected the benefits decision and less weight where the administrator has taken active steps to reduce potential bias and to promote accuracy. *Id.* at 117.  In the absence of a conflict, the administrator's decision can be upheld if it is grounded on any reasonable basis, but where the administrator is also the insurer, the abuse of discretion standard requires a more complex analysis. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630

(9th Cir. 2009). The analysis requires the court to consider numerous case-specific factors including, but not limited to, the extent to which a conflict of interest appears to have motivated an administrator's decision. *Id.* The court may also consider the quality and quantity of medical evidence, whether the plan administrator required an in-person medical examination or relied on the review of existing medical records, and whether the administrator provided its independent experts with all of the relevant evidence. *Id.*

In assessing the effect of a conflict of interest, the court must view evidence of bias in the light most favorable to the claimant. *Stephan v. Unum Life Ins. Co.*, 697 F.3d 917, 930 (9th Cir. 2012). The plan administrator bears the burden of proving that its decision was not improperly influenced by its dual role as administrator and insurer. *Muniz*, 623 F.3d at 1295. Regardless of whether an administrator's conflict of interest is a factor, however, an abuse-of-discretion review requires consideration of all the circumstances. *Pacific Shores Hosp.*, 764 F.3d at 1042.

## II.   FACTUAL BACKGROUND

Plaintiff was born and raised in Morocco where he worked as a chef. He may have had polio as a child. When he was 27 years old, he emigrated from Morocco and shortly thereafter began working for Marriott International Inc. as a chef. When Plaintiff was 36 years old, in approximately March 2009, he developed pain and swelling in his right foot. In October 2009, he became unable to continue working as a specialty restaurant chef, a job for which he was paid approximately $57,500/year, because it required long periods of standing and walking, which resulted in swelling and pain in his right ankle and foot.

Marriott hired Plaintiff October 25, 2000. Marriott is the plan administrator of Defendant Marriott International Inc. Long-Term Disability Plan (the "Plan"). Defendant Aetna Life Insurance Company insures the Plan and is the claim administrator for the Plan. Plaintiff was a participant in the Plan as a result of his employment with Marriott.

The Plan's long-term disability coverage pays a monthly benefit to an employee who is disabled and unable to work because of an illness, injury, or disabling pregnancy-related condition, after the first 182 days of a period of disability.  Under the Plan's test of disability, monthly benefits are payable for the first 24 months if the employee cannot perform the material duties of his "own occupation" solely because of an illness, injury, or disabling pregnancy-related condition and his earnings are 80% or less of his adjusted pre-disability earnings.   The Plan defines "own occupation" as the occupation the employee is routinely performing when his period of disability begins, viewed as it is normally performed in the national economy.

The Plan's test of disability changes from "own occupation" to "any occupation" after the first 24 months that monthly benefits are payable.   After 24 months, the employee meets the Plan's test of disability on any day that he is unable to work "at any reasonable occupation" solely because of an illness, injury, or disabling pregnancy-related condition.  The Plan defines "reasonable occupation" as any gainful activity for which the employee is, or may reasonably become, fitted by education, training, or experience, and which results in, or can be expected to result in, an income of more than 60% of the employee's adjusted pre-disability earnings.

Initially, Plaintiff received short-term disability benefits.   Plaintiff's first day absent from work was October 25, 2009, and his date of disability under the Plan was November 5, 2009.  In September 2009, Plaintiff reported right foot pain and swelling that had begun approximately six months before.  In February 2010, he had surgery to relieve tightness in his right calf and subsequently reported dramatic improvement with minor pain when walking.  In March 2010, Plaintiff had surgery to increase the range of motion in his right ankle and subsequently reported pain-free range of motion in his right ankle.  In April 2010, Plaintiff reported swelling in his right foot after standing on it for a long period of time.  He returned to work, but after ten continuous hours of being on his feet, the swelling increased dramatically and was very painful.  On May 4, 2010, Plaintiff

was treated with a local block of the right common peroneal nerve, which significantly reduced, but did not eliminate, his right ankle pain.

Also on May 4, 2010, Plaintiff's treating orthopedist Ralph N. Purcell, M.D., wrote to Aetna that on April 22, 2010, he advised Plaintiff not to work because of swelling and pain over his right tibia at the site of his surgery. Dr. Purcell said Plaintiff reported the swelling occurred after being on his feet for ten hours at work, but Plaintiff "had done extraordinarily well without any symptoms prior to his being on his feet for such a protracted period of time." Dr. Purcell also stated that Plaintiff "was doing wonderfully postoperatively and his dramatic improvement postoperatively was the basis for his return to work." He recommended ankle support for protracted weight bearing. In an Attending Physician Statement dated April 26, 2010, Dr. Purcell opined that Plaintiff was able to do sedentary work activity 8 hours/day, 5 days/week, but should do no prolonged standing and no pushing, pulling, or lifting. He attributed Plaintiff's impairment to pain and swelling of the right ankle.

From May 8, 2010,[1] through August 23, 2012, Plaintiff received long-term disability benefits under the Plan's "own occupation" test of disability, based on a determination that Plaintiff was unable to work as a specialty restaurant chef. On June 26, 2010, Aetna sent a letter to Plaintiff explaining that he was eligible to receive monthly benefits effective May 8, 2010, and continuing for up to 24 months as long as he remained disabled from his own occupation. The letter further explained that if he was still disabled from his own occupation and eligible for disability benefits on May 8, 2012, the Plan would require him to meet a more strict definition of disability. It informed Plaintiff that to qualify for monthly benefits, he would be required to provide medical evidence that he was unable to perform any reasonable occupation for which he was

---

[1] Although initially his long-term disability benefit was to be effective May 6, 2010, it was adjusted to May 8, 2010, because he had returned to work on April 21 and 22, 2010.

qualified or could become qualified as a result of his education, training, or experience. If he qualified for continuation of benefits, Aetna would periodically review his eligibility by requesting updated medical information from Plaintiff's medical providers, independent physicians, or vocational specialists.

In July 2010, Plaintiff received peripheral nerve decompression and neurolysis of the right common peroneal nerve.  In September 2010, Plaintiff underwent right hip arthroscopic surgery.  In October 2010, he reported to Aetna that he was in a cast from his hip surgery and would have another surgery in December 2010.  The record does not show that Plaintiff had surgery in December 2010.

In May 2011, an Aetna representative interviewed Plaintiff by telephone regarding his current status.  Plaintiff reported experiencing a lot of pain in his right ankle that radiated to his back.  He said he could not be on his feet more than 30 minutes and had difficulty sleeping.  He said that his wife did most of the housework, but he was able to prepare meals and do home exercises.  Plaintiff said that it had been about three months since his last office visits with his treating providers.  The Aetna representative's notes regarding the telephone interview do not indicate that Plaintiff had any difficulty communicating in English.

In June 2011, Plaintiff reported difficulty walking, swelling in his ankle, tingling near his toes, and radiating pain up his leg into his buttocks.  He said any standing exacerbated his symptoms greatly and that he had recently received a burning treatment to his lower leg while in Morocco.  In July 2011, MRIs of Plaintiff's right knee, right hip, and lumbar/cervical spine and x-rays of lumbar spine and right hip were not clinically significant regarding his symptoms except for a new right hip labral tear.  Plaintiff reported pain and swelling between his ankle and heel on his right foot.

On July 28, 2011, treating podiatrist Stephen L. Barrett, D.P.M., completed an Attending Physician Statement.  Dr. Barrett opined that Plaintiff was able to do sedentary work, but unable to continuously stand/walk more than one hour at a time.  He reported

that Plaintiff had presented with swelling of the right ankle on July 25, 2011, and an MRI had been ordered.  Dr. Barrett assessed Plaintiff as able to perform occasional climbing, crawling, kneeling, carrying, bending, twisting, standing, stooping, and walking.  He assessed Plaintiff as able to perform continuous (5.1-8 hours/day) lifting, pulling, pushing, reaching above shoulder, and forward reaching while sedentary.  Dr. Barrett said that Plaintiff could not drive because his prescribed pain medication could cause drowsiness.

On August 2, 2011, a clinical consultant for Aetna reviewed the medical records in support of Plaintiff's claim.  She concluded that the restrictions and limitations of no standing or walking for more than an hour at a time were supported and would likely be ongoing.  She opined that the restrictions and limitations did not appear to preclude the performance of full-time sedentary work activities.  The clinical consultant recommended confirming her opinion with Dr. Barrett and Dr. Purcell and obtaining updated medical records.

On September 27, 2011, Aetna's vocational counselor spoke by telephone with Plaintiff, who said that his work history was limited to cooking.  Plaintiff expressed interest in participating in vocational rehabilitation services to assist him in identifying alternate job goals, assess his interests and areas of strength, and discuss possible retraining and job placement options.  That same day the vocational counselor completed a Transferable Skills Analysis based only on Plaintiff's predicted sedentary work capacity, work history as a chef, and education consisting of one year of college.  She did not find any sedentary occupations that were a "good" match for Plaintiff's transferable skills.  She concluded that the occupation of hotel sales representative was a "fair/limited" match for Plaintiff's transferable skills because Plaintiff lacked any sales experience and his computer skills were limited.  Although the vocational counselor had spoken with Plaintiff at least two times, she did not note any limitation in his ability to communicate in English.

- 8 -

On September 21, 2011, Plaintiff began treatment at the Arizona Center for Pain Relief and was seen by Brittany Jones, P.A., for pain of the low back, right hip, and right leg, which reportedly had occurred in an intermittent pattern for ten years. Pain medications were prescribed. On October 19, 2011, Plaintiff was seen by J. Julian Grove, M.D., of the Arizona Center for Pain Relief, who noted that Plaintiff had experienced significant relief and slight functional improvement, but also noted that Plaintiff reported no change in pain.

On October 28, 2011, Dr. Grove completed an Attending Physician Statement, in which he opined that Plaintiff had "no ability to work" and stated that "Patient has only been seen twice but he came in on a 0 work status."[2] Dr. Grove indicated that Plaintiff can never perform climbing, crawling, kneeling, lifting, pulling, pushing, reaching above shoulder, forward reaching, carrying, bending, or twisting. He further indicated that Plaintiff can occasionally perform sitting, standing, stooping, or walking. Dr. Grove also opined that Plaintiff can frequently carry 1-5 pounds, occasionally carry 6-20 pounds, and never carry more than 20 pounds. He identified Plaintiff's primary diagnosis as lumbosacral neuritis and his secondary diagnosis as "pain in joint ankle/foot."

On November 30, 2011, an investigator interviewed Plaintiff at his home and reported that Plaintiff was wearing pajamas at 11:00 a.m. and sat with his right leg elevated on the sofa. Plaintiff reported that he does not often leave home and his wife does all of the household chores, shopping, and driving. On December 13, 2011, an investigator videotaped about two minutes of Plaintiff walking in his driveway, speaking with someone, returning to the residence, and driving away in a vehicle. The investigator noted that Plaintiff walked with a slight limp. The investigator followed Plaintiff driving for about 30 minutes. On December 14, 2011, the investigator observed Plaintiff driving

---

[2] At that point Plaintiff had been seen twice at the Arizona Center for Pain Relief—once by Dr. Grove and once by PA Jones.

the same vehicle with children in the back seat.  On two other days, surveillance efforts were continued, but Plaintiff was not observed outside of or departing his home.

Plaintiff was seen by PA Brittany Jones of the Arizona Center for Pain Relief on November 16, 2011, December 15, 2011, and January 10, 2012, for routine medical follow up and pain medicine prescriptions.

In January 2012, Plaintiff underwent left knee ACL reconstruction.  In a February 2012 follow-up visit, Plaintiff reported that he had no complaints with his left lower extremity, but his right knee, hip, and foot had been giving him "some problems."  He was progressing well with physical therapy and home exercises and was referred to a foot and ankle specialist, Dr. Michael Castro.

On March 6, 2012, Plaintiff told PA Brittany Jones that his knee was feeling well, but his altered gait had increased his right lower extremity pain.  On April 4, 2012, Plaintiff appeared at Dr. Grove's office, but the doctor was delayed and could not see Plaintiff.  Medication refills were ordered and Plaintiff was directed to return in one month.

The record includes a facsimile of an Attending Physician Statement with Dr. Grove's signature dated April 6, 2012.  Except for the dates next to Dr. Grove's signature, the two pages with signatures are identical—same handwriting, same comments, and same marginal notations—to the corresponding two pages of the Attending Physician Statement dated October 28, 2011.  Both the October 28, 2011 statement and the April 6, 2012 statement include the handwritten comment that "Patient has only been seen twice but he came in on a 0 work status."  These pages with signatures both indicate that Plaintiff has "no ability to work" and is capable of working zero hours/day zero days/week.  Instead of stating prescribed restrictions on work activities and an estimated return to work date, both statements say only that "Patient is not working."  The first pages of the statements, which describe diagnoses, medications, and office visit dates, are not identical and do not include a signature.

In March 2012, three months before the Plan's test of disability would change from "own occupation" to "any reasonable occupation," Aetna began attempting to obtain updated medical records from Plaintiff's treating physicians for clinical review by a nurse consultant. On May 8, 2012, after 24 months of long-term disability benefits, the test for evaluating Plaintiff's claim changed from whether he was capable of performing the material duties of his "own occupation" to whether he could perform the material duties of "any reasonable occupation." On May 8, 2012, after repeated requests, Aetna received the records requested from Dr. Grove and referred Plaintiff's claim to a nurse consultant for a clinical review on May 9, 2012. On May 9, 2012, the nurse consultant reviewed clinical information from December 2011 through April 2012. She noted that Plaintiff appeared to be recovering well from left knee surgery, but continued to have chronic pain from his right knee and ankle. She noted that Dr. Grove opined that Plaintiff was unable to work. The nurse consultant opined that the current records supported finding functional impairment, but recommended obtaining updated medical records in about four months from pain management, orthopedics, and Dr. Castro, the foot/ankle specialist, if Plaintiff had been seen by him.[3]

On June 1, 2012, an investigator observed Plaintiff leave his home alone, drive to a store where he met two men and entered the store with the men. He stood and talked to the men inside the store. After leaving the store, Plaintiff drove to a convenience store, entered, departed carrying items, and drove home. On June 2, 2012, the investigator observed Plaintiff drive to a bank, park the car, get out of the car, use the automatic teller machine, enter the bank, exit the bank, and drive home. On his way home, Plaintiff stopped several times in different parking lots and appeared to be texting on his cell phone.[4]

---

[3] The record does not show that Plaintiff ever saw Dr. Castro.

[4] The private investigation firm also found Internet videos of televised cooking segments performed by Plaintiff while he worked for Marriott, a web site for Plaintiff's

On June 26, 2012, Aetna requested peer review of Plaintiff's claim by Malcom McPhee, M.D., Board Certified in Physical Medicine and Rehabilitation, to assess the effect that any physical conditions would have on Plaintiff's functionality for the period May 8, 2012, through May 7, 2013.  Dr. McPhee reviewed the records provided, including operative notes, radiology reports, and office notes from February 2010 through April 2012.  He reviewed the July 28, 2011 Attending Physician Statement by treating podiatrist Stephen L. Barrett, D.P.M., which stated that Plaintiff was capable of performing sedentary work, but unable to continuously stand/walk more than one hour at a time.  He viewed the surveillance video from June 1 and 2, 2012.  Dr. McPhee observed Plaintiff on June 1 walking from his car to a store "with an equal stride length and no limp while wearing flip flops."  He observed Plaintiff on June 2 walking from his car and back "without any observable gait difficulty."  Dr. McPhee noted that Plaintiff's file did not include details of when he became infected with the polio virus, a detailed neurological examination, or a detailed neuromuscular exam of the lower right extremity.  Nevertheless, Dr. McPhee found general evidence of right lower extremity atrophy, which would reasonably limit walking to an occasional basis and short distances.  He further concluded it would be reasonable to limit Plaintiff's standing to no more than a frequent basis for 30–60 minutes at a time followed by a brief five-minute break to sit.

Dr. McPhee's peer review included peer-to-peer consultation.  On July 2, 2012, he attempted to contact treating orthopedist Dr. Stacey McClure, who performed Plaintiff's left knee arthroscopy in January 2012.  Dr. McPhee spoke with Dr. McClure's medical assistant, who indicated that Plaintiff's left knee was fully functional and would not preclude work activity.  Dr. McPhee also attempted to contact Dr. Grove and spoke with PA Brittany Jones, who had treated Plaintiff multiple times.  She said that Plaintiff's left leg and foot muscles were very functional, but his right leg and foot had functional

catering business that appeared to be inactive, and a LinkedIn account.

limitations.  She advised limiting Plaintiff to changing to a seated position after standing for 30–60 minutes.

On July 5, 2012, Dr. McPhee completed his initial peer review.  He opined that, based on the provided documentation and telephonic consultation, Plaintiff's functional impairments from May 8, 2012, through May 7, 2013, would limit standing to 30–60 minutes before changing positions and limit walking to short distances such as 50 feet at any one time.  He further opined that a reasonable estimate of physical demand level would be a light level with the additional restrictions of limiting walking to short distances such as 50 feet at any one time and limiting standing to 30–60 minutes and then changing positions for five minutes.  He opined that Plaintiff could lift/carry up to 10 pounds frequently and 20 pounds occasionally and that sitting would be unrestricted.  Dr. McPhee also stated, "There were no providers advising restrictions or limitations for the time period in question."  On July 10, 2012, copies of Dr. McPhee's peer review report were mailed to Dr. Grove and Dr. McClure.

On July 11, 2012, Aetna requested that a Telephonic Evaluation and Transferable Skills Analysis be conducted by Coventry Health Care, vocational rehabilitation consultants.  On July 13, 2012, Maria Provini-Salas, Coventry Vocational Case Manager, spoke with Plaintiff by telephone.  She said that Plaintiff reported he had received the equivalent of a high school diploma, was able to use a computer for Internet and email use, enjoyed occasional swimming, and received on-the-job training to eventually become a chef.  She did not document any difficulty communicating with Plaintiff in English.

To determine Plaintiff's transferable skills, Ms. Provini-Salas reviewed, among other things, the job description of Plaintiff's last position, specialty restaurant chef, which was provided by Plaintiff's employer and dated April 2009.  The job summary states:

Accountable for the quality, consistency and production of the specialty restaurant kitchen.  Exhibits culinary talents by personally performing tasks while leading the staff and managing all food related functions. Coordinates menus, purchasing, staffing and food preparation for the property's specialty restaurant.  Works with team to improve guest and associate satisfaction while maintaining the operating budget.  Must ensure sanitation and food standards are achieved.  Develops and trains team to improve results.

Core work activities include, among many others:

- Plans and manages food quantities and plating requirements for the specialty restaurant.

- Ensures compliance with all local, state and federal (e.g., OSHA, ASI and Health Department) regulations.

- Supervises and coordinates activities of cooks and workers engaged in food preparation.

- Utilizes interpersonal and communication skills to lead, influence, and encourage others; advocates sound financial/business decision making; demonstrates honesty/integrity; leads by example.

- Ensures associates are cross-trained to support successful daily operations.

- Ensures associates understand expectations and parameters.

- Sets and supports achievement of kitchen goals including performance goals, budget goals, team goals, etc.

- Improves service by communicating and assisting individuals to understand guest needs, providing guidance, feedback, and individual coaching when needed.

- Handles guest problems and complaints.

- Interacts with guests to obtain feedback on product quality and service levels.

- Identifies the developmental needs of others and coaching, mentoring, or otherwise helping others to improve their knowledge or skills.

- Manages associate progressive discipline procedures.

- Participates in the associate performance appraisal process, providing feedback as needed.

- Assists as needed in the interviewing and hiring of associate team members with appropriate skills.

Additional responsibilities include: "Provides information to supervisors, co-workers, and subordinates by telephone, in written form, e-mail, or in person." Basic competencies, *i.e.*, "fundamental competencies required for accomplishing basic work activities," include:

- **Basic Computer Skills** – Using basic computer hardware and software (e.g., personal computers, word processing software, Internet browsers, etc.).
- **Mathematical Reasoning** – The ability to add, subtract, multiply, or divide quickly, correctly, and in a way that allows one to solve work-related issues.
- **Oral Comprehension** – The ability to listen to and understand information and ideas presented through spoken words and sentences.
- **Reading Comprehension** – Understanding written sentences and paragraphs in work related documents.
- **Writing** – Communicating effectively in writing as appropriate for the needs of the audience.

On July 18, 2012, Ms. Provini-Salas reported to Aetna that Plaintiff has a variety of transferable skills and abilities, which include thinking creatively; making decisions and solving problems; coordinating the work and activities of others; getting information; inspecting equipment, structures or material; establishing and maintaining interpersonal relationships; resolving conflicts and negotiating with others; monitoring and controlling resources; and communicating with supervisors, peers, or subordinates. Ms. Provini-Salas concluded that the following occupations are consistent with Plaintiff's transferable skills and the functional capacities and restrictions identified in Dr. McPhee's July 5, 2012 peer review: food/beverage controller, supervisor order taker, hotel sales representative, repair order clerk, timekeeper, and referral clerk for a temp agency. Each of the positions was classified as sedentary with a wage of more than the target wage of $17.19 per hour. Ms. Provini-Salas reported that she had used the following resources:

Bureau of Labor statistics, OASYS software, the Occupational Outlook Handbook, the Dictionary of Occupational Titles, and O*NET.

On July 20, 2012, Dr. Grove wrote a letter to Aetna stating that Plaintiff "suffers from chronic and long-standing right lower extremity radiating pain." He said that Plaintiff's symptoms had "been going on for more than 20 years" and had "led to surgical intervention in the right knee and right foot and ankle." He stated that Plaintiff "has been evaluated for a postpolio syndrome, as this was prevalent where he grew up in the middle east." Dr. Grove opined that Plaintiff "cannot sit for longer than 20 minutes to an hour and has to get up and walk around due to the right lower extremity radiating pain." He further opined that Plaintiff "can stand for approximately 5-10 minutes at a time." He also noted that Plaintiff requires medications due to the severity of his pain, but "has unfortunately suffered many side effects with current pain medications, including Percocet and Lyrica, which make him dizzy." Dr. Grove's letter does not refer to Dr. McPhee's July 5, 2012 peer review report or specifically address any of Dr. McPhee's findings.

On August 1, 2012, Aetna requested additional peer review by Dr. McPhee based on Dr. Grove's July 20, 2012 letter. On August 8, 2012, Dr. McPhee spoke by telephone with Dr. Grove, who had personally seen Plaintiff once. In response to Dr. McPhee's questions, Dr. Grove said he had not restricted Plaintiff's driving, he had based his limitations regarding Plaintiff's ability to stand only for 10-15 minutes on what Plaintiff had told him, and he believed Plaintiff could work with restrictions. Dr. McPhee asked Dr. Grove whether certain walking, standing, and lift/carry restrictions and unrestricted sitting with change of position for five minutes every hour would be reasonable. Dr. Grove agreed with the restrictions and limitations Dr. McPhee posed. Dr. McPhee also reported, "I described the video surveillance that I viewed and Dr. Grove was pleased with his functioning."

On August 8, 2012, Dr. McPhee submitted his additional peer review in which he addressed the opinions expressed in Dr. Grove's July 20, 2012 letter.  Dr. McPhee noted that the letter explained that Plaintiff's symptoms had been going on for more than 20 years and had received surgical interventions to address right lower extremity concerns due to the effects of polio.  Dr. McPhee further noted that after these procedures, Dr. Barrett reported Plaintiff was unable to stand/walk for more than an hour at a time.  In Dr. McPhee's opinion, the residual right lower extremity problems would not prevent Plaintiff from all work activity.  Dr. McPhee also noted that the video surveillance showed that Plaintiff was able to walk with an equal stride length and no limp or observable gait difficulty while wearing flip-flops.  Dr. McPhee noted that the video surveillance indicated that any chronic swelling that may have been present appeared mild and would not prevent all work activity.  Regarding the duration of sitting, standing, and walking, Dr. McPhee noted that Dr. Grove based his opinion on Plaintiff's self-report.  Finally, although Dr. Grove's July 20, 2012 letter reported dizziness caused by Percocet and Lyrica, Dr. Grove's office visit records did not mention dizziness, and Plaintiff's driving and walking as captured on video did not indicate any dizziness.  Dr. McPhee concluded that Dr. Grove's letter did not include any new information that would cause Dr. McPhee to alter his prior opinion.

In a letter dated August 23, 2012, Aetna notified Plaintiff that his long-term disability benefits were being terminated effective August 24, 2012.  The letter explained that Plaintiff's long-term disability policy provided benefits for 24 months if he could not "perform the material duties of his own occupation" solely because of illness or injury and his earnings were 80% or less of his adjusted pre-disability earnings.  It further explained that after the first 24 months of disability benefits, he would meet the plan's test of disability if he was "unable to work at any reasonable occupation" solely because of illness or injury.  It defined "reasonable occupation" as "any gainful activity:

- For which you are, or may reasonable [*sic*] become, fitted by education, training, or experience; and
- Which results in, or can be expected to result in, an income of more than 60% of your adjusted pre-disability earnings."

The August 23, 2012 letter stated that Plaintiff's benefits began on May 8, 2010, the first 24 months of benefits ended as of May 7, 2012, and benefits were paid beyond the initial 24 months while Aetna completed its review. It further stated that Aetna had recently completed its review and concluded that Plaintiff no longer met the policy's test of disability. It then stated the sources of medical documentation reviewed, how the peer review was conducted, and the occupations it had determined would satisfy the "any reasonable occupation" criteria, i.e., for which Plaintiff would have the necessary skills and earn a reasonable wage of $17.19 per hour. The letter further stated that Aetna would review any additional information Plaintiff cared to submit.

On October 25, 2012, Plaintiff saw Lisa Piccione, M.D., of Desert Ridge Family Physicians for left knee pain. Upon physical examination, Dr. Piccione found moderately reduced range of motion in the left knee and atrophic right quadriceps and hamstring. She reported his primary language as English.

On November 7, 2012, Plaintiff began treatment at Valley Pain Consultants. The office note does not identify whether he was seen by an anesthesiologist or a physician assistant. The office note states that Plaintiff presented with pain in the right lumbar area, right buttock, right thigh, right lower leg, and the right foot. Pain scores included a current level of 8/10, average level of 5/10, minimum pain level of 2/10, and maximum pain level of 8/10. Plaintiff reported that symptoms are exacerbated by standing and walking, but are relieved by opioid analgesics. It appears that pain medications were prescribed. On November 7, 2012, Nikesh Seth, M.D., of Valley Pain Consultants wrote to Dr. Piccione that Plaintiff had been "getting good relief with opioids which allows him to maintain functionality."

On November 13, 2012, Dr. Cory Nelson of Spine Orthopedic Specialists evaluated Plaintiff for left knee pain.  He noted that Plaintiff said he had had symptoms and weakness in his right lower extremity for several years, developed instability in his left knee, had left ACL reconstruction, and continued to experience pain and weakness. After physical examination, Dr. Nelson opined that the left knee instability was related to left quadriceps weakness and atrophy.  Dr. Nelson recommended that Plaintiff resume physical therapy for knee extension, quadriceps strength, and gait training.

On December 5, 2012, Plaintiff was seen at Valley Pain Consultants.  The provider noted a current pain level of 4/10, symptoms as unchanged, and pain as constant.  The provider consulted with Dr. Seth, who advised changing one of the pain medications.

On January 8, 2013, Plaintiff was seen again at Valley Pain Consultants.  The provider reported a current pain level of 4/10.  Plaintiff reported unchanged symptoms and constant pain, and the provider noted "good tolerance of treatment and good symptom control."  The provider further noted that the opioid side effects did not include dizziness, drowsiness, or constipation.

On February 5, 2013, Plaintiff was seen by Dr. Seth at Valley Pain Consultants. Dr. Seth wrote that Plaintiff was a high school graduate who reported constant low back and right lower extremity pain, exacerbated by standing and walking.  Plaintiff also reported swelling in his left knee and pain on movement and swelling in his right ankle. Plaintiff reported a current pain level of 6/10.  Dr. Seth's physical examination findings included no edema in either lower extremity, normal muscle strength and tone in upper and lower extremities, some decreased sensation along the dorsum of the right foot, walking on toes impaired, and tandem gait mildly antalgic on the right side. Musculoskeletal findings included mildly positive straight leg raising on the right side, mild tenderness in the back and knees, and moderate tenderness with mild swelling along

the right lower ankle.  Dr. Seth also wrote that Plaintiff reported "pain relief with current medication regimen without side effects or impairments."

On February 19, 2013, Plaintiff appealed Aetna's August 23, 2012 termination of Plaintiff's long-term benefits.  With the letter of appeal, Plaintiff's attorney included Valley Pain Consultants' records of office visits dated November 7, 2012, through February 5, 2013, and a short statement written by Plaintiff dated February 15, 2013.  The statement reported that Plaintiff went to elementary school from age 6 to 13, lived in Morocco until age 27, worked as a gardener until age 20, worked as a dish washer until age 23, and then began cooking.  Plaintiff's attorney stated, "Mr. Yaakoubi is demonstrably unable to write English with any degree of proficiency."  The attorney's letter also reported that Plaintiff "continues to suffer from fatigue, swelling of the extremities, dizziness, numbness, trouble walking, and constant burning, stabbing pains in the right lumbar area and throughout the right leg and foot."  The attorney asserted that with limited education and lack of computer skills and English proficiency, Plaintiff is unable to work in the white-collar office, sales, and managerial occupations identified by Aetna.

On February 20, 2013, Dr. Seth provided Plaintiff with a "left knee injection in office to help with some mild arthritis."  Plaintiff asked Dr. Seth to provide a statement regarding his diagnoses and the impact on his ability to work.  Dr. Seth recommended that Plaintiff obtain a Functional Capacity Exam by his physical therapist.  On February 28, 2013, Dr. Seth performed a right L2 lumbar sympathetic block "to help with vague nerve type pain" in his right lower extremity.

On March 13, 2013, Aetna requested that Plaintiff provide updated medical records.  On March 20, 2013, Plaintiff was seen at Valley Pain Consultants.  He reported a current pain level of 8/10 and that relief provided by a lumbar nerve block was only temporary.  The provider ordered a lumbar MRI and pain medications.

On April 11, 2013, Plaintiff's attorney provided Aetna with updated medical records, a statement by Plaintiff regarding his attempt to return to work in March 2013, and a photograph of Plaintiff's swollen ankle taken on March 18, 2013.  Plaintiff said that he was hired as a Banquet Sous Chef at the Phoenician Resort in Phoenix, he completed a two-day orientation involving mostly sitting, but on subsequent days he had to take breaks and leave early because of pain, swelling, and occasional inability to move his legs.  He said that at the end of each hour he would sit in the office and then go back to work in the kitchen where after four hours his leg would get really tired and after six hours his foot would begin to swell.  He did not return to work after March 18, 2013.

On appeal, Aetna asked Edward Klotz, M.D., Board Certified in Internal Medicine and Pulmonology, to review the Aetna Transferrable Skills Analysis Report dated July 18, 2012.  On May 14, 2013, Dr. Klotz concluded that the documents provided to him showed no functional impairment from an internal medicine point of view and no physical or cognitive examination findings of any functional impairment suggesting that Plaintiff's ability to work had been directly impacted by an adverse medication effect during the period from August 24, 2012, through May 31, 2013.  He stated that his review was not sufficient to evaluate the transferable skills analysis from an internal medicine point of view.

Aetna also asked Stuart Rubin, Board Certified in Physical Medicine and Rehabilitation, to review the Aetna Transferrable Skills Analysis Report dated July 18, 2012.  On May 21, 2013, Dr. Rubin concluded that the documents provided to him did not support finding Plaintiff had functional impairments from August 24, 2012, through May 31, 2013, despite multiple abnormal findings.  Dr. Rubin commented that some findings were inconsistent, such as right quadriceps atrophy on October 25, 2012, left quadriceps atrophy on November 13, 2012, and no musculoskeletal abnormalities noted on March 20, 2013.[5]  Other abnormal findings were mild or moderate.  Dr. Rubin opined

---

[5] Plaintiff argued in his opening brief that Dr. Rubin referred to March 2, 2013, for

that Plaintiff can work at the light level with standing limited to 30-60 minutes at one time.  He noted that on July 20, 2012, Dr. Grove wrote that Percocet and Lyrica had made Plaintiff dizzy.  Dr. Rubin reviewed O*NET Online job descriptions for nine occupations and found no specific physical demands that would preclude Plaintiff from performing those jobs.  He concluded that all of the occupational alternatives identified in the Transferrable Skills Analysis were appropriate, including food beverage controller, supervisor order taker, hotel sales representative, repair order clerk, timekeeper, and referral clerk for a temp agency.

In a letter to Plaintiff's attorney dated June 18, 2013, Aetna notified Plaintiff that after its appeal review of the termination of Plaintiff's long-term disability benefits, the original decision, effective August 23, 2012, was upheld.  The letter described the reviews by Dr. Klotz and Dr. Rubin, the video surveillance performed on June 1 and 2, 2012, and Dr. Nelson's treatment notes.  Regarding the video surveillance, the letter stated:  "On both occasions, your client was observed walking with an equal stride length and did not exhibit a limp and/or any observable gait difficulty."  The letter concluded:

> In summary, although your client has multiple abnormal findings, that include moderately reduced range of motion of uncertain knee, atrophic right quadriceps and hamstrings, decreased right hip flexor strength and decreased quadriceps compared to the left as of October 25, 2012, mildly positive straight leg raise on the right on February 05, 2013, and received a right knee injection on February 20, 2013, for osteoarthritis of the left knee, and it was also noted that there was a suspicion of complex region[al] pain syndrome of the left lower extremity, however, physical examination findings to correlate with this assessment was not proven.  As of March 20, 2013, there were no notations of any musculoskeletal abnormalities.  In addition, although there was notation that the medications Percocet and Lyrica were making your client dizzy, the provided documentation does not reflect that there were any physical or cognitive examination findings of any functional impairment suggesting that your client's ability to work has been directly impacted by an adverse medication effect as of August 24, 2012.

which there was no record, but Dr. Rubin actually referred to March 20, 2013.

- 22 -

The letter stated that Plaintiff's file had been referred to a vocational specialist, who identified several occupational alternatives for which Plaintiff was qualified based on his education, training, experience, and physical capabilities.  Finally, the June 18, 2013 letter informed Plaintiff that the original decision to terminate long-term disability benefits effective August 24, 2012, was final and he had the right to bring a civil action under ERISA within one year.

On August 14, 2014, Plaintiff filed his complaint in this action.  He seeks recovery of long-term disability benefits from August 23, 2012, through the present and until such time as he is no longer disabled under the terms of the Plan.

## III.   ANALYSIS

### A.   Standard of Review

The Plan is established by the Policy, an agreement entered into by and between Aetna and Marriott.  Among other things, the Policy incorporates the Booklet-Certificate, which is the Certificate of Coverage and includes the Schedule of Benefits.  In the Policy, Aetna and Marriott agreed that Aetna is "a fiduciary with complete authority to review all denied claims for benefits under this Policy" and "shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein."   (Doc. 33-1 at 30.)  Moreover, Aetna and Marriott agreed that Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously. (*Id.*)  Aetna and Marriott also agreed that Aetna would pay benefits in accordance with the terms of the Policy and the reasonable exercise of Aetna's business judgment. (Doc. 33-1 at 14.)

Because the Plan unambiguously grants Aetna discretionary authority to grant or deny benefits, the Court reviews Aetna's benefit decisions for abuse of discretion, considering all the circumstances.   Because Aetna both evaluates claims and pays

benefits claims under the Plan, the Court considers that structural conflict of interest and views evidence of bias in the light most favorable to Plaintiff.

**B.** **Viewing Evidence of Bias in the Light Most Favorable to Plaintiff, the Evidence Does Not Show that Aetna's Conflict of Interest Improperly Influenced Its Decision to Terminate Plaintiff's Long-Term Disability Benefits.**

Plaintiff contends that Aetna's bias is demonstrated by its use of "paper reviewers," "Dr. McPhee's purported success in changing Dr. Grove's mind," "Dr. McPhee's misrepresentation of the surveillance," and Aetna's "focus on surveillance."

Plaintiff concedes Aetna was not required to evaluate Plaintiff in person, but contends that relying on paper reviews by Dr. McPhee, Dr. Klotz, and Dr. Rubin "raises questions about Aetna's accuracy and thoroughness in reviewing [Plaintiff's] claim." (Doc. 42 at 6.)   Plaintiff argues that Dr. McPhee's paper review cannot establish Plaintiff's true functional abilities because he did not review records dated before February 4, 2010.  However, Plaintiff was able to work until October 25, 2009, and Dr. McPhee reviewed the operative notes for Plaintiff's surgeries in February, March, July and September 2010.  Office notes from before multiple surgeries would not have shed light on Plaintiff's true functional abilities after recovery from the surgeries.

Plaintiff also contends that Dr. Rubin's opinions do not constitute substantial evidence because he did not cite many of the records he reviewed and he focused on records dated after Dr. McPhee's review.  Plaintiff ignores the fact that Aetna asked Dr. Rubin in May 2013 to review the July 2012 Transferable Skills Analysis Report, in response to Plaintiff's appeal, to determine whether Plaintiff had functional impairments from August 2012 through May 2013—not to repeat Dr. McPhee's medical records review.

Further, Plaintiff contends that Dr. McPhee misrepresented the video surveillance and described it to Dr. Grove, thereby tainting Dr. Grove's opinion.  Dr. McPhee reported that he viewed the June 2012 video surveillance and observed Plaintiff driving a car to a

store, walking from his car to the store "with an equal stride length and no limp while wearing flip-flops," driving to a bank and convenience store, and walking from and to his car "without any observable gait difficulty."  Dr. McPhee's report does not state exactly what Dr. McPhee said to Dr. Grove about the video surveillance, only that he described it and Dr. Grove was pleased with Plaintiff's functioning.  If Dr. Grove's independent opinion conflicted with Dr. McPhee's description of the video, he likely would have expressed surprise or disbelief, not that he was pleased with Plaintiff's functioning.

But it is unlikely that Dr. Grove actually held an independent opinion regarding Plaintiff's functionality.  Dr. Grove saw Plaintiff once in October 2011 for pain treatment, did not assess Plaintiff's functionality, and wrote an office note stating Plaintiff had experienced significant relief and slight functional improvement.  Nine days later he completed an Attending Physician Statement opining that Plaintiff had no ability to work based only on the fact that Plaintiff was not working.  In April 2012, Dr. Grove had not seen Plaintiff since October 2011, but a second Attending Physician Statement substantially identical to the first was created with his signature.  In July 2012, Dr. McPhee spoke with PA Jones, who had treated Plaintiff multiple times and described his left leg and foot as very functional, right leg and foot as limiting, and ability to stand as limited to 30-60 minutes at a time with 5-minute seated breaks.  Aetna provided Dr. Grove with opportunity to review and respond to Dr. McPhee's initial report.  On July 20, 2012, Dr. Grove wrote that Plaintiff had chronic swelling and pain in his right lower extremity, which prevented him from sitting more than 20-60 minutes before standing and walking for no more than 5-10 minutes at a time.  After Aetna received Dr. Grove's letter, it requested additional review by Dr. McPhee.  When Dr. McPhee spoke with Dr. Grove about the letter, Dr. Grove stated that he had not restricted Plaintiff's driving, he had relied on what Plaintiff told him, he believed Plaintiff could work with restrictions, and he agreed with the restrictions Dr. McPhee suggested, such as sitting with change of

position for 5 minutes every hour and standing limited to 30-60 minutes.  There is no evidence that Dr. McPhee tainted Dr. Grove's opinion.

Finally, Plaintiff contends that "Aetna's focus on surveillance demonstrates its bias" and "giving surveillance inordinate weight is improper."  However, the record does not show that Aetna gave the surveillance inordinate weight.  Plaintiff states that Aetna did not mention video surveillance in its August 23, 2012 letter explaining Aetna's rationale for determining that Plaintiff was no longer eligible for long-term disability benefits and did mention the June 2012 video in its June 18, 2013 letter upholding the original determination.  Plaintiff also states that neither the peer reviewers nor the letters refer to the December 2011 video surveillance showing Plaintiff walking with a slight limp as though Aetna should have given greater weight to video surveillance, not less.  Further, Plaintiff states, "Dr. McPhee briefly mentioned the June 2012 surveillance in his first report; however, his addendum focuses on the surveillance as the reason to reject [Plaintiff's] complaints and Dr. Grove's position on [Plaintiff's] restrictions."  In fact, the description of the June 2012 video is identical in both reports.  In the addendum Dr. McPhee also referred to it in the context of Dr. Grove's July 20, 2012 letter mentioning that Plaintiff had been evaluated for post-polio syndrome.  Moreover, Plaintiff's medical records are consistent with the video surveillance showing that Plaintiff is able to walk short distances without assistance, stand for short periods of time, and drive without restriction and with no observable dizziness from pain medications.  Aetna did not rely on surveillance while minimizing contrary medical evidence.

Viewing the evidence in the light most favorable to Plaintiff, the evidence shows that Aetna's structural conflict of interest as both claims administrator and insurer did not improperly influence its decision to terminate Plaintiff's long-term disability benefits.

1

2

**C.      Aetna Did Not Abuse Its Discretion by Terminating Plaintiff's Long-Term Disability Benefits.**

3

4

5

6

7

8

9

10

11

12

13

14

15

Plaintiff seeks to recover long-term disability benefits under the Plan from the date they were terminated, August 24, 2012, to the date of judgment and to have his long-term disability benefits reinstated.  There is no dispute about Plaintiff's medical condition or benefit status before August 24, 2012.  The only question is whether Aetna abused its discretion in terminating Plaintiff's long-term disability benefits on August 24, 2012, based on finding a lack of medical evidence showing that a functional impairment precluded Plaintiff from performing work at any reasonable occupation as of August 24, 2012.  Plaintiff contends he is, and has been, unable to work "at any reasonable occupation."   As explained below, Aetna did not abuse its discretion to terminate Plaintiff's benefits because it fully explained its determination, developed facts necessary to its determination, and did not rely on clearly erroneous findings of fact in its determination.  *See Pacific Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1042 (9th Cir. 2014).

16

17

**1.      The Record Supports Aetna's Determination that Plaintiff Could Perform Light Work with Limited Standing and Walking As of August 24, 2012.**

18

19

20

21

22

23

24

25

26

27

Aetna determined that Plaintiff was unable to work as a specialty restaurant chef from November 5, 2009, through August 23, 2012.  His multiple surgeries during this period precluded performing the material duties of his "own occupation," *i.e.*, specialty restaurant chef, which requires standing and walking for many hours.  For example, in April 2010, Plaintiff returned to work as a chef, but experienced swelling in his right lower extremity after being on his feet for ten hours.  As a result, his treating orthopedist opined that Plaintiff could perform full-time sedentary work, but not work involving prolonged standing.  In July 2011, his treating podiatrist also opined that Plaintiff could perform sedentary work, but he could not continuously stand/walk for more than one hour at a time.

28

Plaintiff's medical records after August 23, 2012, do not show that he became unable to perform sedentary work. During multiple office visits with pain management providers from November 2012 through February 2013, Plaintiff reported receiving pain relief from oral pain medications without side effects or impairments. In November 2012, Plaintiff's treating orthopedist evaluated Plaintiff for left knee pain. Based on physical examination, the orthopedist opined that Plaintiff's left knee instability was related to left quadriceps weakness and atrophy, and he recommended physical therapy. In February 2013, upon physical examination, Plaintiff's treating pain management specialist found Plaintiff had normal muscle strength and tone in upper and lower extremities, mild tenderness in the back and knees, and moderate tenderness with mild swelling along the right ankle. The specialist observed that Plaintiff walked with a slight limp on the right side. Two weeks later, the specialist injected Plaintiff's left knee for what he described as "mild arthritis." A week later, the specialist performed a lumbar nerve block for "vague nerve type pain" in his right lower extremity. In March 2013, Plaintiff reported that the relief provided by the lumbar nerve block had been temporary, and he was prescribed oral pain medications. There is no medical evidence in the record that shows that Plaintiff was unable to perform sedentary work after August 23, 2012.

Plaintiff reported that in March 2013 he tried to return to work as chef. His ability to complete a two-day orientation that involved mostly sitting indicates that he was capable of performing sedentary work. His inability to work in the kitchen, which required standing with only brief breaks, does not show that he could not perform sedentary work.

Aetna did not reject reliable evidence from Plaintiff and did not rely on clearly erroneous findings of fact in its determination. Plaintiff's evidence does not contradict Aetna's determination that Plaintiff was capable of performing light work with unrestricted sitting, standing limited to 30-60 minutes before changing positions for 5 minutes, and walking limited to no more than 50 feet at a time.

**2.    The Record Supports Aetna's Determination that "Reasonable Occupations" that Plaintiff Was Capable of Performing Existed as of August 24, 2012.**

The Plan defines "reasonable occupation" as any gainful activity for which the employee is, or may reasonably become, fitted by education, training, or experience, and which results in, or can be expected to result in, an income of more than 60% of the employee's adjusted pre-disability earnings.   Aetna determined that the following occupations could be performed with Plaintiff's skills and functional limitations and would produce a reasonable wage of $17.19 per hour:   food/beverage controller, supervisor order taker, hotel sales representative, repair order clerk, timekeeper, and referral clerk for a temp agency.  Plaintiff contends the 2012 Transferable Skills Analysis by Coventry Health Care, vocational rehabilitation consultants, was flawed because (1) it relied on Plaintiff's reported level of education; (2) it assumed that Plaintiff possessed the skills and abilities required for the position he had successfully performed for many years; (3) it used $17.19/hour instead of $17.48/hour as the target wage; and (4) it conflicted with the 2011 Transferable Skills Analysis by an Aetna vocational counselor.

Aetna's records and Plaintiff's medical records consistently indicated that Plaintiff had at least a high school education.  It is possible that when Plaintiff reported how many years of education he had completed, Plaintiff said "13," but meant until the age of 13 years, not 13 years of education.  In the fall of 2011, Aetna's vocational counselor spoke with Plaintiff at least twice in the fall of 2011 and continued to think Plaintiff had completed one year of college when she discussed with him seeking a new line of work. In July 2012, Plaintiff reported that he did not have one year of college education when an Aetna employee spoke with Plaintiff by telephone:

> EDUCATION/TRAINING:  Mr. Yaakoubi reports to have the equivalent of a high school diploma in this country that he obtained in his native Morocco.  He reportedly did not complete a year of college level work as indicated in his work history/education questionnaire but rather completed his high school education.  He reportedly received on the job training to eventually become a chef.

In February 2013, Plaintiff's pain specialist noted that Plaintiff was a high school graduate.  About the same time, Plaintiff's attorney told Aetna that Plaintiff "left school at age 13."  Plaintiff's attorney attached a statement from Plaintiff that stated he went to elementary school from the age of 6 until the age of 13.  The attorney also attached materials from O*NET related to the six occupations identified by Aetna.  The O*NET documents show that most of the occupations usually require a high school diploma or equivalent, and some require additional vocational training, on-the-job training, or experience.  They do not show, however, that if Plaintiff did not complete high school, it would preclude his ability to perform any of the six occupations.  It was not necessary for Aetna to determine whether Plaintiff's on-the-job training and experience constituted the equivalent of a high school education because the job description for his last position provided a detailed explanation of its requisite skills and competencies.

Plaintiff worked as a chef for about fourteen years, the last nine of which for the Marriott.  By October 2009, he earned approximately $57,500 annually and was responsible for planning, management, supervision, legal compliance, guest relations, and maintaining the operating budget for a specialty restaurant kitchen.  His job description required basic computer skills, mathematical reasoning, oral comprehension, reading comprehension, and writing skills.[6]  Aetna did not abuse its discretion by identifying as transferable skills and abilities the fundamental competencies required for accomplishing the basic work activities of the job he had successfully performed for many years.

To identify reasonable occupations, Aetna used a target wage of $17.19/hour, calculated as 60% of Plaintiff's last wage adjusted for cost-of-living changes.  Aetna determined the target wage in July 2012.  Plaintiff incorrectly contends that 60% of Plaintiff's last wage, i.e., $16.60, should have been adjusted by 1.7% for 2012 as well as 0% for 2010 and 3.6% for 2011, even though the 2012 year had not ended.  Nevertheless,

---

[6] Plaintiff does not contend that the job description for Specialty Restaurant Chef that Marriott provided to Aetna is incorrect.

even if Aetna should have used $17.48 as the target wage, five of the six occupations would have produced a wage greater than $17.48.

Finally, Plaintiff contends that Aetna should not have relied on the 2012 Transferable Skills Analysis by Coventry Health Care instead of the 2011 Transferable Skills Analysis performed by Aetna's vocational counselor. The vocational counselor called Plaintiff September 27, 2011, to discuss vocational rehabilitation and to ask whether he thought he would be able to participate in vocational rehabilitation services. Plaintiff said his doctor told him he would need to seek a new line of work based on his standing and walking restrictions. Plaintiff said he was interested in participating in vocational rehabilitation services. The vocational counselor encouraged Plaintiff to address vocational rehabilitation services with his doctor. She recommended that Plaintiff be referred to a local rehabilitation counselor for assistance with vocational exploration, possible retraining, and job placement options after obtaining a functional capacity assessment from his pain management specialist. Plaintiff did not tell her that he was unable to write correct sentences in English as he now contends, and she did not note any difficulty communicating with Plaintiff in English.

After the telephone conversation, on the same day, the vocational counselor performed a preliminary Transferable Skills Analysis, based on limited and somewhat hypothetical information. The vocational counselor assumed that eventually Plaintiff would be able to perform a full-time sedentary job although at the time he was released to work only one hour a day. The vocational counselor did not have the Marriott job description for Specialty Restaurant Chef or a functional capacity assessment by a treating provider. Using only his work history as a chef and education as one year of college, the vocational counselor found one occupation, which she considered to be a "fair/limited," not "good," match for his transferable skills because Plaintiff lacked sales experience and had only limited computer skills. Aetna was not required to rely on the

internal 2011 Transferable Skills Analysis based on incomplete and hypothetical information.

Thus, Aetna did not abuse its discretion by determining that Plaintiff was capable of performing a reasonable occupation as of August 24, 2012.

### 3.    Aetna Fully Explained Its Benefits Determination.

Aetna's August 23, 2012 letter stated the terms of the long-term disability policy, including the test of disability that applied after 24 months and the definitions of "reasonable occupation" and "adjusted pre-disability earnings."  It explained that although the initial 24 months of long-term disability benefits ended May 7, 2012, Aetna paid benefits beyond the initial 24 months while it completed review of Plaintiff's claim. The letter identified the doctors from whom Aetna had obtained medical documentation, summarized the medical records, described the peer review process, and stated its conclusions regarding Plaintiff's capabilities and limitations.  It then identified occupations for which Plaintiff had the necessary skills that would produce a reasonable wage.  The letter stated that Plaintiff's claim was terminated and no further benefits were payable beyond August 23, 2012.  The letter informed Plaintiff, however, that Aetna would review any additional information Plaintiff cared to submit and described in detail the type of information needed.  It also informed Plaintiff of his right to seek a review of the decision with specific information regarding how to do so.

Aetna's June 18, 2013 letter explained the test of disability Plaintiff was required to meet to obtain long-term disability benefits after the initial 24 months and stated that, effective August 24, 2012, Plaintiff's benefits were terminated due to a lack of medical evidence to support a functional impairment that precluded Plaintiff from performing work at any reasonable occupation as of August 24, 2012.  The letter stated that Aetna forwarded Plaintiff's file to independent physician reviewers who specialized in internal medicine and rehabilitation and summarized their findings, which supported the initial termination decision.    The letter stated that Aetna's original decision to terminate

Plaintiff's long-term disability benefits was upheld, final, and not subject to further review.  It also explained that if Plaintiff disagreed with the determination, Plaintiff had the right to bring a civil action under ERISA within one year of the final decision of his claim.

Considering all the circumstances, the Court finds that Aetna did not abuse its discretion to terminate Plaintiff's long-term disability benefits effective August 24, 2012.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Judgment on the Administrative Record (Doc. 34) is denied.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendant and against Plaintiff.  The Clerk shall terminate this case.

Dated this 9th day of December, 2015.

Neil V. Wake
United States District Judge